**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**KYLE S. HATMAKER,**

     **Plaintiff,**

                         **Civil Action 2:21-cv-1173**

     **v.**

                         **Magistrate Judge Chelsey M. Vascura**

**COMMISSIONER OF SOCIAL
SECURITY,**

     **Defendant.**

## OPINION AND ORDER

Plaintiff, Kyle S. Hatmaker ("Plaintiff"), brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his applications for social security disability insurance benefits ("DIB") and supplemental security income benefits ("SSI").  The parties have consented to jurisdiction pursuant to 28 U.S.C § 636(c).  (ECF Nos. 7, 8.)  Pending before the Court is Plaintiff's Statement of Errors (ECF No. 20), the Commissioner's Memorandum in Opposition (ECF No. 21), and the administrative record (ECF No. 15).  Plaintiff did not file a Reply.  For the reasons that follow, the Court **REVERSES** the Commissioner's non-disability determination and **REMANDS** this matter to the Commissioner and the ALJ pursuant to Sentence Four of § 405(g).

## I.      BACKGROUND

Plaintiff protectively filed his DIB and SSI applications on August 2, 2018, alleging that he became disabled on June 13, 2017.  (R. at 12, 174–84, 185–90.)  Plaintiff's applications were denied at the initial level in November 2018 (R. at 109–11, 112–14), and at the reconsideration level in April 2019 (R. at 117–18, 119–21).  A telephonic hearing was held on June 2, 2019,

before an Administrative Law Judge (the "ALJ"), at which Plaintiff, represented by counsel, appeared and testified. (R. at 26–44.) On July 31, 2020, the ALJ issued an unfavorable determination. (R. at 9–25.) On January 1, 2019, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final determination. (R. 1–6.) Plaintiff timely sought judicial review of the Commissioner's final determination. (ECF No. 1.)

In this action, Plaintiff asserts that the ALJ's residual functional capacity ("RFC")[1] determination is not supported by substantial evidence because the ALJ erred when he did a subjective symptom analysis (a.k.a. "credibility determination"). (ECF No. 19.) The Court concludes that Plaintiff's contention of error lacks merit.

## II.   THE ALJ's DECISION

On July 31, 2019, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 9–25.) The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through September 30, 2023. (R. at 14.)

---

[1] [1] A claimant's RFC is an assessment of "the most [he] can still do despite [his] limitations." 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1).

At step one of the sequential evaluation process,[2] the ALJ found that Plaintiff had not engaged in substantial gainful activity since June 13, 2017, his alleged date of onset. (*Id.*) At step two, the ALJ found that Plaintiff had the following severe impairments: diabetes mellitus, type 1 with neuropathy affecting the feet; hepatitis C; a lumbar spine strain; hypertension; headaches; depression; attention-deficit hyperactivity disorder ("ADHD"); and anxiety. (R. at 15.) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 15.)

The ALJ then set forth Plaintiff's RFC as follows:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: (1) occasional crouching crawling, kneeling, stooping, balancing, and climbing of ramps and stairs; (2) no climbing of

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. §§ 404.1520(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?

2. Does the claimant suffer from one or more severe impairments?

3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §§ 404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

> ladders, ropes, or scaffolds; (3) no work around hazards, such as unprotected heights or dangerous machinery; (4) no driving of automotive equipment; (5) occasional use of the lower extremities for pushing, pulling, and operating foot controls; and (6) limited to performing simple, repetitive tasks of SVP1 or SVP2.

(R. at 17.)

At step four, the ALJ relied on testimony from a vocational expert ("VE") to find that Plaintiff was unable to perform his past relevant work. (R. at 19.) At step five, the ALJ again relied on testimony from a VE to determine that, in light of Plaintiff's age, education, work experience, and RFC, jobs existed in significant numbers in the national economy that he could perform. (R. at 20.) The ALJ therefore concluded that Plaintiff was not disabled under the Social Security Act, since June 13, 2017, the alleged date of onset. (R. at 21.)

### III.     RELEVANT RECORD EVIDENCE[3]

#### A.     Plaintiff's Testimony

At the June 2, 2020, hearing, Plaintiff testified to the following facts about his physical impairments and limitations. Plaintiff had been diagnosed with diabetes and had complications with it. (R. at 36.) It was unclear what type of diabetes he had, and his providers were just starting to figure out that he was a type 1 diabetic. (*Id*.) His doctor had just increased his insulin dosage the "other day." (*Id*.) He did not use an insulin pump but used a device that was like an EpiPen to inject himself and tested his glucose one to two times a day. (*Id*.) His numbers were still higher than his doctor desired— running from 170 to 220 or 230. (*Id*.) But Plaintiff's doctor had told Plaintiff that he had gained approximately 40 pounds over the last six-to-eight months because his A1C levels were finally down to where they were supposed to be. (R. at 33.)

---

[3] Because Plaintiff's allegations of error pertain to his physical impairments, the Court limits its discussion to the same.

Plaintiff had neuropathy and nerve damage in his feet and legs that moved up towards his thighs.  (R. at 37.)  He experienced "real bad" shocks in his legs that sometimes "dropped" him.  (*Id*.)  His toes were very numb, and his calves were pretty numb, and it was hard to function.  (*Id*.)  He also experienced pain.  (*Id*.)  Plaintiff was trying to manage his pain and everything that went along with it and hoped that it would get better with time.  (R. at 38.)

 Plaintiff lived on a 100-acre farm and tried to help his father out there as much as he could for room and board but his condition made it difficult to do so.  (R. at 34–35.)  He would help mow half the yard or split a tiny bit of wood or do chores depending on how he was feeling that day.  (R. at 35.)

## B.    Medical Records

On July 21, 2017, Plaintiff sought emergency-room treatment for elevated blood sugar in the 600s, lightheadedness, and numbness and pain in his feet.  (R. at 378, 575.)  He reported that he was an insulin dependent diabetic but that he had lost his insurance and had a "hard time" with his medical bills and insulin.  (*Id*.)  Lab results showed that his glucose was 602.  (R. at 382, 579.)  Plaintiff was aggressively hydrated with IV fluids and given insulin.  (R. at 383, 580.)  He was offered an additional 1/3 liters of fluid, but he declined because he felt better, wanted to go home, and needed a cigarette.  (*Id*.)  Plaintiff was instructed to follow up with his PCP the following week or to return if he developed new or increased symptoms.  (*Id*.)

On November 22, 2017, Plaintiff sought treatment from Joshua Bryant, CNP ("CNP"), because his diabetes was getting worse.  (R. at 315.)  Plaintiff indicated that he was taking Novalin twice a day but wanted a new insulin regimen.  (*Id*.)  Plaintiff reported that his diabetes had not been well controlled for the last several years and that he had cysts on his back for which he was interested in surgical evaluation.  (*Id*.)  Plaintiff also reported that he had difficulty

following a diabetic diet, drank a lot of diet and regular soda, and that he had been out of diabetes medication for one to two months.  (*Id*.)  He denied medication side effects but reported some foot pain.  (*Id*.)  The CNP examined Plaintiff's foot and found that Plaintiff had normal sensation, but that his pedal pulse was 2+, or slightly diminished.  (R. at 316.)  Plaintiff was prescribed a Lantus Solution Pen-injector; ReliOn Blood Glucose test strips, and Metformin HCl.  (*Id*.)  The CNP noted that the Lantus might be too expensive and that he would attempt to find an affordable alternative for Plaintiff if that was the case.  (*Id*.)  Plaintiff was advised to return in four weeks to follow up about his diabetes.  (R. at 317.)  It appears that he did not, however, follow up as advised.  (R. at 318.)

On March 23, 2018, Plaintiff reported to his CNP that he had been taking levemir and metformin up until a week prior to his appointment when he ran out of medication.  (*Id*.)  Plaintiff also reported that he had stopped taking his medication because he thought it caused him increased neuropathy and pain, and that his leg pain and neuropathy had been worsening.  (*Id*.)  A foot examination found that Plaintiff had mildly diminished sensation to monofilament in the left lateral foot; normal strength; his pedal pulse was 2+; and he had mild callous formation.  (R. at 319.)  Plaintiff's prescriptions were refilled, and he was started on Novolog and Gabapentin.  (*Id*.)  Plaintiff was urged to quit smoking.  (R. at 320.)

Records from Plaintiff's CNP dated July 5, 2018, indicate that Plaintiff had not taken insulin in two days and that he had signs of DKA.  (R. at 300, 305.)  Plaintiff reported to the CNP that he had difficulty following a diabetic diet; experienced a lot of depression following a job loss; had been lying in bed all day; and had not been taking his medication consistently.  (R. at 322.)  Plaintiff further reported that gabapentin was not helping with his neuropathic pain.  (*Id*.)  The CNP noted that Plaintiff did not tolerate Novolog because it made him feel sick and

that an effort would be made to get Humalog approved.  (R. at 300.)  A foot examination found that Plaintiff had mildly diminished sensation to monofilament in the left lateral foot; normal strength; and his pedal pulse was 2+.  (R. at 323.)  Plaintiff was instructed to stop taking Novolog and increase his Gabapentin.  (*Id*.)  Plaintiff was also instructed to go to the ER for management and to follow up for further evaluation.  (R. at 300, 305, 323.)

At an emergency room visit later that day, Plaintiff was diagnosed with ketoacidosis.  (R. at 326, 362–71, 567.)  Plaintiff was treated with IV fluids and insulin.  (R. at 326, 362–71, 566.)  X-rays of Plaintiff's chest revealed no evidence of acute chest disease.  (R. at 375, 572.)

During a follow up appointment with his CNP on July 12, 2018, Plaintiff reported that he was taking his medications, feeling better, and interested in managing his diabetes and seeing a nutritionist.  (R. at 326–27.)  Plaintiff was advised to continue checking his blood sugars and recording his numbers.  (R. at 303, 327.)  He was also given advice about medication administration and referred to a dietician.  (R. at 303, 327–28.)

On July 19, 2018, Plaintiff met with a registered dietician ("RD").  (R. at 329.)  At that appointment, Plaintiff indicated that he had previously received some education from a PCP and seen a dietician but that limited resources prevented him from following the guidelines that had been provided to him.  (*Id*.)  Plaintiff indicated that he was unemployed; lived by himself; his food choices/availability were limited by his finances/resources; he had applied for food stamps and utilized food banks/soup kitchens.  (*Id*.)  He acknowledged a history of poor diabetes control and medication compliance but was currently titrating his insulin based on guidance from his PCP.  (*Id*.)  He reported that he did not exercise regularly due to constant discomfort/neuropathy.  (R. at 330.)  Plaintiff was provided with diet education and advised to engage in aerobic exercise

7

150 minutes a week. (R. at 332.) The RD noted Plaintiff's "limited adherence to diabetes nutrition management recommendations due to a lack of financial resources." (*Id*.)

On August 3, 2018, Plaintiff reported to his CNP that his overall blood sugars had been better and that his neuropathy was somewhat better. (R. at 334.) On September 6, 2018, Plaintiff reported to his RD that his average blood sugars were down from the low to mid-300s to the high 200s. (R. at 338.) Plaintiff also reported that he had been trying to be more active and was walking more, but he could not walk at a fast pace or for an extended time due to his pain. (R. at 339.) The RD again noted Plaintiff's "limited adherence to diabetes nutrition management recommendations due to a lack of financial resources." (R. at 342.)

On September 6, 2018, Plaintiff reported to his CNP that he was satisfied with his current medication regimen. (R. at 344.) He again reported that he had been trying to be more active and was walking more, but he could not walk at a fast pace or for an extended time due to his pain. (R. at 344.) He indicated that his blood sugars had been in the mid to high 200s, but his neuropathy had been "really bad" lately. (R. at 350.) Plaintiff was prescribed duloxetine for his neuropathy and depression. (R. at 350, 351.) The CNP noted that he discussed with Plaintiff a V-go, a wearable insulin patch, and a continuous glucose monitoring device ("CGM"), and that an attempt would be made to get insurance to cover these items. (R. at 348.) Plaintiff also reported a new diagnosis of hepatitis C and that he was interested in pursuing treatment for that eventually. (R. at 350.)

A September 18, 2018, CT of Plaintiff's abdomen showed a benign nonfunctioning adenoma in his left adrenal gland but no other abnormalities in his abdominal organs including his liver. (R. at 359, 556.)

On October 11, 2018, Plaintiff reported to his CNP that his blood sugar was running in the higher 200s.  (R. at 601.)  The CNP noted that Plaintiff's V-go and CGM had not been approved.  (R. at 602.)  He was advised to continue self-titrating his insulin and to maintain glucose logs.  (*Id*.)  Plaintiff was referred to a gastroenterologist because of poorly controlled diabetes and symptoms of possible gastroparesis.  (R. at 602–03.)  On October 25, 2018, Plaintiff reported to a CNP that his blood sugar had been around 300+.  (R. at 604.)  The CNP noted that Plaintiff continued to have hyperglycemia despite an increase in his insulin.  (R. at 605.)

On November 16, 2018, Plaintiff reported to a consultative psychological examiner that he had discontinued duloxetine because of its side effects.  (R. at 428.)

On November 26, 2018, Plaintiff reported to his CNP that his blood glucose was running in the low 250s, and that his neuropathy was stable.  (R. at 442, 607.)  The CNP noted that Plaintiff's blood sugar levels were about 50 points better since he had started metformin.  (R. at 443, 608.)  An examination of Plaintiff's foot found that he had normal sensation and strength; his pedal pulse was 2+, or slightly diminished; and a visual examination of his foot was normal. (*Id*.)

On December 10, 2018, Plaintiff reported to a physician that he had not taken his mediation or checked his blood sugar for the last few days.  (R. at 436.)  The physician noted that Plaintiff's diabetes was controlled with a combination of OHGD and insulin.  (*Id*.)  Plaintiff admitted to symptoms of numbness and tingling, and an examination revealed neuropathy.  (R. at 436, 437.)  Plaintiff further admitted to smoking 6–10 cigarettes a day.  (R. at 437.)  The physician discussed with Plaintiff weight management and strength training.  (*Id*.)

On November 30, 2018, Plaintiff was referred to a cardiologist for shortness of breath and persistent sinus tachycardia. (R. at 455.) A December 14, 2018 echocardiogram revealed normal left ventricular systolic function. (R. at 455, 532–37.)

On January 10, 2019, Plaintiff indicated to his CNP that his blood sugar was consistently running in the 225–300 range. (R. at 445, 610.) Plaintiff reported that he had been taking his metformin incorrectly because mistook the milligram amounts in his pills. (*Id*.) He also acknowledged failing to take insulin for two weeks while he was out of state. (*Id*.) An examination of Plaintiff's foot found that he had normal sensation and strength; his pedal pulse was 2+, or slightly diminished; and a visual examination of his foot was normal. (R. at 446, 611.)

On January 18, 2019, Plaintiff reported to his cardiologist that he was feeling better than he had at a previous visit. (R. at 452.) He also reported that he was compliant with his medications but was smoking half a pack of cigarettes a day despite trying to quit. (R. at 452, 453.) Upon examination, Plaintiff's dorsalis pedal pulses were 2+ on the right and left. (R. at 454.) The cardiologist's impression was inappropriate sinus tachycardia likely due to deconditioning, but that it was not pathologic and did not require intervention. (*Id*.) The cardiologist further noted that Plaintiff needed to quit smoking, had a history of failing to address his diabetes and developing neuropathy, but that Plaintiff was currently more compliant with his medications. (*Id*.)

At an April 15, 2019 follow-up with his CNP, Plaintiff reported that he had not been taking his insulin for two weeks because he needed to give his stomach a break. (R. at 614.) He also reported that his blood sugar had consistently been in the mid-200s. (*Id*.) Upon examination, Plaintiff's foot had normal sensation and his pedal pulse was 2+, or slightly

diminished. (R. at 615.) He was strongly advised to comply with his diabetes medications and urged to quit smoking. (R. at 615, 616.)

Plaintiff sought treatment from a podiatrist in Spring 2019. On May 15, 2019, he reported burning and tingling in both feet and sought diabetic foot care. (R. at 668.) He denied any other pedal complaints and stated that his diabetes was well controlled. (*Id*.) Upon examination, Plaintiff had no edema or varicosities, intact light touch and gross sensation, but he had three symptomatic, pre-ulcerative hyperkeratotic lesions on his feet which were debrided. (R. at 668.) Orthotics were prescribed and they appeared to fit well at follow-up visits. (R. at 668, 671, 675.) At all of his podiatric visits, Plaintiff reported that he smoked 10–19 cigarettes a day. (R. at 667, 671, 675.)

On July 18, 2019, Plaintiff again reported that his blood sugar was around 200+. (R. at 619.) Plaintiff was interested in obtaining a CGM, but he needed to prove that he could check his glucose four times a day to receive a prescription for one. (R. at 620.)

On August 20, 2019, Plaintiff reported that he had been successfully treated for hepatitis C, his blood sugar had mostly been in the 200s, and that he was more consistently using insulin. (R. at 624.) On October 22, 2019, however, Plaintiff reported that his blood sugar was in the 250–300 range and that he had not been taking his insulin as prescribed. (R. at 627.) A V-go patch was discussed, and Plaintiff appeared confident that he could use one given that use of one meant he would not need to carry needles. (*Id*.) A foot examination found normal sensation and strength and calluses. (R. at 628.) The CNP wrote that he would attempt to obtain a V-go patch through insurance. (*Id*.) On October 22, 2019, the CNP wrote that reviewed with Plaintiff how to use a V-go patch by sharing an instructional video and utilizing a demonstration device. (R. at 630.)

An MRI of Plaintiff's lumbar spine on August 23, 2019, showed mild degenerative changes in the facet joints bilaterally at L4-5 and L5-S1 without significant stenosis of the spinal canal or neural foramina.  (R. at 518.)  Plaintiff also participated in physical therapy in Fall 2019 for low back pain.  (R. at 480.)  During an evaluation on August 7, 2019, Plaintiff reported that his low back pain and bilateral neuropathy in both legs had been worsening and that he had intermittent shooting pains in his shins.  (R. at 480.)  His low back pain was worse in the morning and when he went to bed, and that it was exacerbated by bending forward and standing for extended periods.  (*Id*.)  He scored 4 or 4+ out of 5 on strength testing of his left and right hips, knees, and ankles, and had a positive slump test on the right.  (R. at 482.)  Plaintiff had no edema.  (*Id*.)  Plaintiff had reduced bilateral arm swing and thoracic lateral lean with his gait, but even right left stance and swing phase.  (*Id*.)  The PT's impression was possible nerve impingement, and that Plaintiff would benefit from therapy to improve pain and reduced thoracolumbar range of motion, and core and bilateral lower extremity weakness.  (R. at 483.)  At a subsequent visit, the PT's impression was also that therapy would improve Plaintiff's balance, functional activities, and dizziness.  (R. at 487.)

Composite scores on dynamic gait tests during PT sessions showed that Plaintiff was a "safe ambulator."  (R. at 490, 492.)  Plaintiff noted soreness or stiffness after therapy sessions in October 2019.  (R. at 493, 494, 495.)  But Plaintiff also noted at sessions in August, September, and October 2019 that his pain or stiffness increased after vacationing, using a rider mower, farm activities including bailing hay and running a weed eater, and that he had been cutting trees or firewood for a couple of weeks and that his pain could be due to that.  (R. at 494, 496, 497, 499, 504, 508, 509, 513.)  A progress letter dated October 18, 2019, indicated that Plaintiff did not perceive any improvement in his function or pain levels with therapy.  (R. at 636.)  The PT's

impression was that Plaintiff's dizziness and balance had improved significantly but his low back pain had plateaued. (R. at 640.) The PT noted that plaintiff had continued to participate in daily hard labor including chopping trees and heavy lifting and that may have impacted his progress. (*Id*.)

At a September 12, 2019, appointment with a neurologist, Plaintiff indicated that his back pain was mild, a 3 or 4 on a 10-point scale, but that his leg pain was more like a 7 to 8 out of 10. (R. at 641.) He further reported that Lyrica did not seem to be as effective as Gabapentin had been and that it wore off quickly. (*Id*.) The neurologist wrote that it was unclear if Plaintiff was taking his Lyrica properly, and they discussed changing the milligrams he took to reduce the number of pills he needed to take. (*Id*.) Upon examination, Plaintiff had 5/5 strength in the lower right extremity and 4+ to 5- on the left. (R. at 644.) His tandem gait was ataxic. (*Id*.)

On January 27, 2020, Plaintiff reported to his CNP that he was having problems following a diabetic diet because it was too expensive and that he did not have his first meal of the day until 1pm. (R. at 632.) Plaintiff additionally reported that he was checking his blood sugar once or twice a day, that it was in the 150-200 range, and that his insurance would not cover his V-go patch after his first month of use. (*Id*.) Plaintiff reported that Lyrica was helping him with his leg pain although his big toe had been hurting and throbbing for a few weeks. (*Id*.) Upon examination, Plaintiff's foot had normal sensation and strength and his pedal pulse was 2+, or slightly diminished. (R. at 633.)

At a March 12, 2020 visit with a neurologist, Plaintiff admitted to smoking ten cigarettes a day and using chewing tobacco. (R. at 462.) He complained of neuropathic pain radiating from his feet to his hands and forearms. (R. at 463.) He also reported discomfort, pressure, and redness in his hands and forearms. (R. at 463.) Plaintiff indicated that increasing his Lyrica pills

13

to four a day had seemed to improve his neuropathy pain but that his insurance company was only allowing him three pills per day. (R. at 463.) He also indicated that he had taken duloxetine, amitriptyline, and nortriptyline for his neuropathy pain in his feet but that he had experience side effects with them. (R. at 463.) Upon examination, he had normal muscle tone and strength but an antalgic gait with pain in the plantar aspects of his feet with walking. (R. at 463.)

## C.    Medical Opinions and Prior Administrative Findings

On October 16, 2018, state agency reviewer, David Knierim, M.D., reviewed Plaintiff's file at the initial level. (R. at 54–56, 68–70.) Dr. Knierim found that Plaintiff was limited to occasionally lifting or carrying 20 pounds and frequently carrying or lifting 10 pounds. (*Id*.) Dr. Knierim also found that Plaintiff was limited to standing or walking for six hours and sitting for six hours during normal eight-hour workdays. (*Id*.) Dr. Knierim further found that Plaintiff could only occasionally climb ramps/stairs, climb ropes/scaffolds, stoop, kneel, crouch, or crawl; and could only frequently balance. (*Id*.)

On March 25, 2019, state agency reviewer, Bradley J. Lewis, M.D., reviewed Plaintiff's file at the reconsideration level. (R. at 85–87, 101–03.) Dr. Bradley found the same lifting and carrying limitations (i.e., 20 pounds occasionally and 10 pounds frequently) and the same standing/walking and sitting limitation (i.e., 6 hours in an eight-hour workday) as Dr. Knierim. (*Id*.) But Dr. Bradley also found that Plaintiff was limited to only frequently operating foot controls in both of his lower extremities. (*Id*.) Dr. Bradley additionally found the same postural limitations as Dr. Knierim, except that Dr. Bradley further found that Plaintiff could never climb ladders, ropes, or scaffolds. (*Id*.) In addition, Dr. Bradley found that Plaintiff needed to avoid unprotected heights and dangerous machinery due to his neuropathy. (*Id*.)

On June 1, 2020, Plaintiff's CNP filled out a medical opinion from indicating that he had treated Plaintiff since November 2017.  (R. at 664.)  The CNP opined that Plaintiff was limited to standing or walking for two hours and sitting for six hours during normal eight-hour workdays.  (*Id*.)  The CNP further opined that Plaintiff could occasionally lift or carry 50 pounds and frequently carry or lift 20 pounds.  (*Id*.)  The CNP additionally opined that Plaintiff would need freedom to shift at will between sitting and standing/walking; to lie down at unpredictable times during an eight-hour workday; and be absent from work more than four times a month.  (*Id*.)

## IV.    STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).

Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an

opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007).

## V. ANALYSIS

As explained previously, Plaintiff alleges that the ALJ's RFC determination was not supported by substantial evidence because the ALJ erred when performing a subjective symptom analysis. (ECF No. 19 at PageID # 745–47.) Specifically, Plaintiff alleges that the ALJ found that Plaintiff's symptoms were not as severe as alleged because he was non-compliant with his diabetes treatment plan, but when making that finding, the ALJ erroneously failed to consider Plaintiff's reasons for non-compliance. Plaintiff particularly alleges that the ALJ failed to consider his inability to pay for treatment as a reason for his noncompliance. Plaintiff's contention has merit.

When evaluating whether an individual's symptoms affect his ability to perform work-related activities, an ALJ may "consider an individual's attempts to seek medical treatment for symptoms and to follow treatment once it is prescribed . . . ." SSR 16-3p, 2016 WL 1119029, at

*8.[4] "Persistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a variety of treatments, referrals to specialists, or changing treatment sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent." *Id*. However, "if the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms, [an ALJ] may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record." *Id*. Nevertheless, before finding that a claimant's symptoms are inconsistent with the record evidence because of his failure to seek or follow prescribed treatment, the ALJ must first consider the "possible reasons [the claimant] may not comply with treatment or seek treatment consistent with the degree of his . . . complaints." *Id*. *See also Johnson v. Comm'r of Soc. Sec.*, 535 F. App'x 498, 506-07 (6th Cir. 2013)

---

[4] For decisions rendered on or after March 28, 2016, the ALJ will evaluate a claimant's statements concerning the intensity, persistence, and limiting effects of symptoms of an alleged disability under SSR 16-3p. SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017). SSR 16-3p superseded SSR 96-7p, 1996 WL 374186 (July 2, 1996), which required the ALJ to evaluate the overall credibility of a plaintiff's statements. In contrast, SSR 16-3p requires the ALJ to evaluate the *consistency* of a plaintiff's statements, without reaching the question of overall *credibility*, or character for truthfulness. *See id.* at *11 ("In evaluating an individual's symptoms, our adjudicators will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation. The focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person."). Although SSR 16-3p supersedes SSR 96-7p, "according to the very language of SSR 16-3p, its purpose is to 'clarify' the rules concerning subjective symptom evaluation and not to substantially *change* them." *Brothers v. Berryhill*, No. 5:16-cv-01942, 2017 WL 2912535, at *10 (N.D. Ohio June 22, 2017). The rules were clarified primarily to account for the difference between a credibility determination, which necessarily impacts the entirety of a claimant's subjective testimony, and a consistency determination, which applies only to specific statements regarding symptoms. *See* SSR 16-3p at *2. It follows, therefore, that the procedures for reviewing an ALJ's credibility assessment under SSR 16-3p are substantially the same as the procedures under SSR 96-7p. Accordingly, the undersigned concludes that existing case law controls to the extent it is consistent with the clarification of the rules embodied in SSR 16-3p's clarification.

(analyzing former SSR 96-7p) (an ALJ can discount allegations of debilitating pain based on a conservative course of treatment, unless the claimant has a good reason for failing to seek more aggressive treatment). One reason for noncompliance that should be considered is that "[a]n individual may not be able to afford treatment and may not have access to free or low-cost medical services." SSR 16-3p, 2016 WL 1119029, at *9. *Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 (6th Cir. 2016) (analyzing former SSR 96–7p) ("[B]efore drawing a negative inference from an individual's failure to [seek or adhere to treatment] the ALJ must consider . . . [whether] 'the individual may be unable to afford treatment.'").

The ALJ explained his subjective symptom analysis as follows:

As for the claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms, they are inconsistent with the overall objective evidence (SSR 16-3p). Turning to the objective evidence, the claimant has severe diabetes mellitus, type I with neuropathy affecting the feet; hepatitis C; a lumbar spine strain; and headaches (Record). The record indicates that the claimant's primary impairment is his history of poorly controlled type I diabetes mellitus (Record). The claimant has had some episodes of diabetic ketoacidosis, however, he has been non-compliant with his diabetes treatment plan (2F/21, 2F/30, 1F, 2F, 3F, 11F). The claimant has been repeatedly "strongly encouraged" to comply with his diabetic treatment plan (11F/15). The claimant has consistently had high A1C numbers and he has delayed following up with endocrinology and late taking insulin (11F/15). The claimant's disregard for his diabetic treatment plan is inconsistent with his complaints of disabling diabetic neuropathy in his feet (SSR 16-3p). Moreover, the claimant stated that he is only intermittently compliant with his back pain treatment plan (10F/43). Notes indicate that when the claimant is compliant with his treatment plans, his symptoms improve (9F/2). In addition, when the claimant is compliant with his treatment plan, his diabetes becomes controlled (7F/4). The record indicates that the claimant is able to control his diabetes with treatment compliance (11F/2). The claimant takes Gabapentin for his reported tingling and numbness (11F/50). On objective physical examination, the claimant regularly demonstrates "grossly intact" sensation to light touch (13F/4, 11F/8, 11F/11, 11F/15, 11F/28, 11F/33, 8F/5, 1F/4 versus 11F/19). When the claimant has been non-compliant, his sensation becomes "mildly" diminished to the distal portion of his feet (11F/19).

(R. at 17–18.) This discussion makes clear that the ALJ determined that Plaintiff's noncompliance with prescribed treatment undermined his subjective complaints. But there is

18

nothing in this discussion indicating that the ALJ considered *any* reasons for Plaintiff's noncompliance even though the record reflects that Plaintiff may have lacked the resources to comply.

The record, for instance, reflects that in July 2017, Plaintiff reported that he had lost his insurance and had "hard time" with medical bills and insulin. (R. at 378, 575.) In July 2018, Plaintiff indicated that limited resources had prevented him from following diet guidelines, that he was unemployed, had applied for food stamps, and utilized food banks or soup kitchens. (R. at 329.) Plaintiff reported in January 2020 that he was having problems following a diabetic diet because it was too expensive and that he did not have his first meal of the day until 1pm. (R. at 632.) Although Plaintiff reported in March 2020 that increasing his Lyrica prescription to four tablets seemed to improve his neuropathy pain, insurance was only "allowing" him three pills a day. (R. at 463.) Plaintiff's providers also noted actual and potential payment issues. For instance, in November 2017, Plaintiff's CNP noted that a prescribed medication might be unaffordable. (R. at 316.) Plaintiff's RD twice noted Plaintiff's "limited adherence to diabetes nutrition management recommendations due to a lack of financial resources." (R. at 332, 342.) The record indicates that Plaintiff's V-go and CGM were not approved in October 2018 (R. at 602), and although it appears that insurance approved a V-go in October 2019 (R. at 630), it also appears that insurance refused to approve it after Plaintiff's first month of use (R. at 632).

In addition to payment issues, the record reflects other reasons why Plaintiff may have been non-compliant with his prescribed treatment. In March 2018, Plaintiff reported that he thought his medications might be causing him increased neuropathy and pain. (R. at 318.) Plaintiff reported in July 2018 that he could not tolerate Novolog because it made him feel sick. (R. at 300.) In November 2018, Plaintiff reported that he stopped taking duloxetine because of

its side effects.  (R. at 428.)  In April 2019, Plaintiff reported that had stopped taking insulin for two weeks because he needed to give his stomach a break.  (R. at 614.)  In March 2020, Plaintiff noted that he experienced side effects with duloxetine, amitriptyline, and nortriptyline.  (R. at 463.)  An ALJ should consider if "side effects may be less tolerable that the symptoms[,]" is a reasons for a claimant's noncompliance.  SSR 16-3p, 2016 WL 1119029, at *9.  Plaintiff also reported difficulty exercising regularly due to constant discomfort/neuropathy (R. at 330), and that when attempting to exercise more, he could not walk at a fast pace or for extended periods because of his pain (R. at 339, 342).  In short, the record reflects a variety of reasons for Plaintiff's noncompliance, but the ALJ's subjective symptom analysis fails to show that the ALJ considered them, or any other reasons for Plaintiff's noncompliance.  Nor did the ALJ inquire about them at the hearing on June 2, 2020.  This constitutes reversible error.

Plaintiff also challenges the ALJ's subjective analysis because the ALJ overstated the impact of his noncompliance given that even when he was compliant, his condition remained significant.  (ECF No. 20, at Page ID # 745.)  The Court notes some record support for this contention.  The record, for instance, reflects that Plaintiff continued to be hypoglycemic in October 2018 despite increases to his insulin dosage.  (R. at 605.)  The record also reflects a one-time low average blood sugar range of 150–200 which appears to have taken place after Plaintiff was prescribed a V-go patch but before his insurance refused to continue paying for it.  (R. at 632.)  It further reflects that when Plaintiff reported compliance, his average ranges continued to be relatively high— in the 200s and 300s.  (*See e.g*., R. at 442, 624.)  The Court does not reach this additional contention of error, but notes that the ALJ may consider it upon remand.

## VI.    CONCLUSION

Based on the foregoing, the Court **REVERSES** the Commissioner's non-disability

determination and **REMANDS** this case to the Commissioner and the ALJ under Sentence Four

of § 405(g) for further consideration consistent with this Opinion and Order.

**IT IS SO ORDERED**.

_/s/ Chelsey M. Vascura_
CHELSEY M. VASCURA
UNITED STATES MAGISTRATE JUDGE